# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: January 7, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| MARYEILEEN SCOTT, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 21-2159V |
| v. | * | |
| | * | Special Master Nora Beth Dorsey |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | Finding of Fact; Onset; Tetanus, Diphtheria, |
| | * | Acellular Pertussis ("Tdap") Vaccine; |
| | * | Rabies Vaccine; Brachial Neuritis. |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Milton Clay Ragsdale, IV, Law Offices of M. Clay Ragsdale, Birmingham, AL, for Petitioner.
Sarah Black Rifkin, U.S. Department of Justice, Washington, DC, for Respondent.

**FACT RULING ON ONSET**[1]

On November 12, 2021, Maryeileen Scott ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq.,[2] (the "Vaccine Act" or "Program"). Petitioner alleges that as a result of a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine she received on November 19, 2018, she suffered a Table

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

injury of brachial neuritis.[3]  Petition at 1-2 (ECF No. 1).  In the alternative, Petitioner alleges a causation-in-fact claim of brachial neuritis following her November 19, 2018 Tdap vaccination.  Id.  Petitioner acknowledged that she also received the third of a series of three doses of the rabies vaccine on the same day, November 19, 2018.  Id. at 1.  The rabies vaccine is a non-covered vaccine.  See 42 C.F.R. § 100.3(a).

After a review of the record as a whole, an onset hearing, and for the reasons set forth below, the undersigned finds by preponderant evidence that Petitioner's onset of pain occurred after Petitioner received her second rabies vaccination on November 5, 2018, two weeks prior to the administration of her Tdap vaccine on November 19, 2018.  Therefore, onset preceded Petitioner's Tdap vaccination and occurred after a non-covered vaccine.

I.      PROCEDURAL HISTORY

On November 12, 2021, Petitioner filed a petition, followed by medical records.  Petition (ECF No. 1); Petitioner's Exhibits ("Pet. Exs.") 1-10.  Petitioner's case was assigned to the Special Processing Unit ("SPU").  Activation and Reassignment Order dated May 5, 2022 (ECF No. 9).  On March 14, 2023, Respondent filed his Rule 4(c) report, arguing "this case is not appropriate for compensation" under the terms of the Vaccine Act.  Respondent's Report ("Resp. Rept.") at 1 (ECF No. 22).

The Chief Special Master issued an Order to Show Cause on March 4, 2024, detailing the issues in Petitioner's case.  Order to Show Cause dated Mar. 4, 2024 (ECF No. 25).  Specifically, the Chief Special Master found Petitioner's symptoms began "48 hours after her second rabies vaccine and 24 hours after the third rabies vaccine."  Id. at 2.  As such, the Chief Special Master determined Petitioner failed to provide preponderance evidence supporting a symptom onset within the appropriate time frame for a Table brachial neuritis post-Tdap injury and failed to provide preponderant evidence needed to counter medical records entries showing her symptoms were due to the rabies vaccine and not the Tdap vaccination.  Id. at 8.  Thereafter, Petitioner requested authorization to retain a medical expert, which was granted, and the case was removed from SPU and reassigned to the undersigned.  Order Reassigning Case dated Apr. 2, 2024 (ECF No. 29); Notice of Reassignment dated Apr. 2, 2024 (ECF No. 30); Order dated Apr. 2, 2024 (ECF No. 31).

Pursuant to the parties' request, a status conference was held on July 16, 2024.  Order dated July 16, 2024 (ECF No. 34).  The parties requested a ruling on onset prior to expending resources for experts.  Id. at 1.  An onset hearing was set for April 1, 2025.  Order dated July 31, 2024 (ECF No. 36).  Prior to the hearing, Petitioner filed witness declarations, and the parties

---

[3] Brachial neuritis "is defined as dysfunction limited to the upper extremity nerve plexus (i.e., its trunks, divisions, or cords).  A deep, steady, often severe aching pain in the shoulder and upper arm usually heralds onset of the condition.  The pain is typically followed in days or weeks by weakness in the affected upper extremity muscle groups.  Sensory loss may accompany the motor deficits, but is generally a less notable clinical feature.  Atrophy of the affected muscles may occur.  The neuritis, or plexopathy, may be present on the same side or on the side opposite the injection.  It is sometimes bilateral, affecting both upper extremities."  42 C.F.R. § 100.3(c)(6).

filed pre-hearing briefs. Pet. Exs. 19-21; Pet. Pre-Hearing Brief ("Br."), filed Dec. 12, 2024 (ECF No. 39); Resp. Response to Pet. Pre-Hearing Br. ("Resp. Pre-Hearing Br."), filed Jan. 16, 2025 (ECF No. 40); Pet. Reply to Resp. Pre-Hearing Br. ("Pet. Pre-Hearing Reply Br."), filed Jan. 31, 2025 (ECF No. 41).

An onset hearing was held on April 1, 2025. Transcript ("Tr.") 1. Mallory Jones, Petitioner, and Ian Rivenbark testified. Tr. 6, 33, 83. Petitioner filed a post-hearing brief on June 9, 2025. Pet. Post-Hearing Br., filed June 9, 2025 (ECF No. 49). Respondent filed his post-hearing brief on June 20, 2025, and Petitioner filed her reply on July 7, 2025. Resp. Response to Pet. Post-Hearing Br. ("Resp. Post-Hearing Br."), filed June 20, 2025 (ECF No. 50); Pet. Reply to Resp. Post-Hearing Br. ("Pet. Post-Hearing Reply Br."), filed July 7, 2025 (ECF No. 51).

This matter is now ripe for adjudication.

## II.     FACTUAL HISTORY

### A.     Summary of Medical Records Related to Onset[4]

Petitioner's medical history prior to vaccination included migraines, gastroesophageal reflux disease ("GERD"), *Clostridioides difficile* infection, obesity, and depression. Pet. Ex. 4 at 233. Past surgical procedures included pilonidal cyst excision (1998, 1999), tonsillectomy (2004), torn right wrist ligament repair (2007), tubal ligation (2010), wisdom teeth extraction (2013), hemorrhoidectomy (2016), mole removal (2016), colonoscopy (2003), and dilation and curettage (2018). Id. at 233-34. Her physical examination on September 17, 2018, two months prior to vaccination, noted that she was active, in no acute distress, and exhibited normal movement of all extremities, with no left shoulder complaints recorded. Id. at 234-35.

Prior to the Tdap vaccination at issue, Petitioner's records show that she received two doses of the rabies vaccine, the first on October 29, 2018 (left arm) and the second on November 5, 2018 (right arm). Pet. Ex. 4 at 222-23. On November 19, 2018, Petitioner received the third dose of the rabies vaccine in her left arm[5] and a Tdap vaccine in her right arm. Id. at 221; Pet. Ex. 1 at 1. The medical record from this visit notes her vaccination appointment occurred between 8:19 A.M. and 8:34 A.M. CST. Pet. Ex. 4 at 221; Pet. Ex. 1 at 1. Petitioner was released without limitations following all three visits, and none of the medical records from those

---

[4] The undersigned has reviewed all of the Petitioner's medical records but only summarizes those pertinent to onset. For a more thorough summary of the records, see Pet. Pre-Hearing Br. at 5-11; Resp. Pre-Hearing Br. at 4-9; Pet. Post-Hearing Br. at 4-10; Resp. Post-Hearing Br. at 2-6.

[5] In a declaration executed on November 9, 2021, Petitioner stated that she received the Tdap vaccine in her affected arm (left). See Pet. Ex. 2 at 3. However, in a status report, Petitioner's counsel asserted the "records indicate that the Tdap was administered in her right arm and that [Petitioner] received the final (of three) rabies shots in her left arm" on November 19, 2018. Pet. Status Rept. filed Mar. 6, 2023, at 1 (ECF No. 21). Because "[t]he neuritis, or plexopathy, may be present on the same side or on the side opposite the injection," Petitioner need not establish that she received the Tdap vaccine in her symptomatic left shoulder to prevail on a brachial neuritis claim. 42 C.F.R. § 100.3(c)(6).

3

visits document complaints of shoulder or arm pain or other adverse effects. Pet. Ex. 4 at 221-23; Pet. Ex. 1.

Approximately three weeks after her November 19, 2018 vaccinations, Petitioner presented to her primary care provider ("PCP"), Dr. Jennifer Marsden, on December 12, 2018 with "complaints of left shoulder pain since receiving [two] injections of the rabies vaccine." Pet. Ex. 4 at 216. Dr. Marsden documented that Petitioner "received a total of [three] [rabies] injections ([one] injection in the right deltoid, [two] in the left deltoid)." Id. On examination, Petitioner's left arm "[m]obility was limited," she was "unable to raise [her] arm above shoulder level," and she had "pain with bilateral rotation" and pain and tenderness on palpation of left shoulder and acromion. Id. at 218. Dr. Marsden noted no swelling or erythema. Id. Dr. Marsden prescribed anti-inflammatory medication and advised follow-up in three weeks if symptoms persisted or worsened. Id.

Petitioner returned to Dr. Marsden on January 4, 2019, approximately three weeks later, "to follow up [on] pain in left shoulder that ha[d] been present since [November 19,] 2018 after receiving a vaccine for rabies." Pet. Ex. 4 at 210. Petitioner's pain was described as a "constant" "sharp, throbbing, [and] achy" pain that worsened with movement. Id. She rated her pain as 7/10 in severity. Id. Petitioner reported "she was [previously] seen by Dr. Marsden and given Naproxen, which ha[d] not helped." Id. Physical examination revealed "decr[eased] active range of motion [in the] [left] shoulder (pain with effort)" and "tenderness to palpation over [the] anterior rot[ator] cuff area." Id. at 212. Dr. Marsden ordered a left shoulder magnetic resonance imaging ("MRI") and referred Petitioner to orthopedics and neurology. Id.

On January 8, 2019, a Vaccine Adverse Event Reporting System ("VAERS") report was completed. Pet. Ex. 11 at 1. It is unclear who completed this report. Id. The report identified the vaccine at issue as the third rabies vaccine administered on November 19, 2018 with an onset date of November 20, 2018. Id. The Tdap vaccine was not mentioned. Id. The adverse event description detailed that

> [Petitioner] state[d] that after getting her third rabies injection[,] the next day [her] arm became sore and within a couple of days she had severe pain when moving her arm. Now, [six] weeks past the incident, she cannot lift her arm up to shoulder height and cannot move her left arm without pain.

Id.

Petitioner underwent an MRI of her left shoulder on January 10, 2019. Pet. Ex. 4 at 52. The record noted "left shoulder pain [at] times and pain with motion [six] weeks after [third] rabies vaccine." Id. The MRI was normal. Id. at 53. "No anatomic cause for pain [was] identified" and "there [was] no fluid collection or inflammatory change to suggest post vaccination complication." Id.

On January 15, 2019, Petitioner consulted orthopedist Dr. Rory Farris at Southern Bone and Joint. Pet. Ex. 5 at 4. She reported a "several month history of left shoulder pain" that "began after a rabies vaccination." Id. at 5. Her pain was located over the "anterior lateral

4

aspect shoulder," the pain worsened with overhead activity, and the pain persisted at night.  Id.
Physical examination "reveal[ed] tenderness at Codman's point [as] well as the bicipital groove,"
"positive Neer Hawkins impingement test," "[p]ositive O'Brien's test," and "rotator cuff strength
5/5."  Id.  Dr. Farris diagnosed left shoulder rotator cuff tendonitis with thickened bursa and
possible superior labrum anterior to posterior ("SLAP") tear.  Id. at 6.  Dr. Farris administered a
corticosteroid injection and recommended follow-up in three weeks.  Id.  Petitioner's intake
questionnaire documented that her left shoulder pain began two months ago (November 2018),
with radiating pain "down to [the] elbow" along with numbness and tingling "in [her] fingers."
Id. at 8.

On January 26, 2019, Petitioner was evaluated at Southeast Neurology by Physician
Assistant Mohammad Qayyum and Dr. Farrukh S. Khan.  Pet. Ex. 6 at 8.  Petitioner reported
"constant pain since rabies vaccine," with "left arm pain [and] [p]aresthesia."  Id. at 8-9.  An
electromyography ("EMG")/ nerve conduction study ("NCS") of the left upper extremity was
conducted that day.  Id. at 22.  The EMG/NCS report documented Petitioner was "[status post]
rabies vaccine in Nov[ember] 2018" with "[complaints of] pain/tingling in hands."  Id.
Impression was "mild left upper ulnar motor neuropathy at the elbow" and findings consistent
with "brachial neuritis at C8, T1."  Id. at 22 (emphasis omitted).  Petitioner followed up on
February 23, 2019, with Dr. Farouk Y. Khan, who diagnosed Petitioner with brachial neuritis
and administered Kenalog and Nubain injections.  Id. at 7, 32.  A subsequent follow-up on
March 19, 2019 recorded persistent "[s]harp pain in [the] left brachial bicep muscle."  Id. at 6.
Assessment remained "brachial neuritis [and] paresthesia."  Id.

On April 16, 2019, Nurse Practitioner ("NP") Laurie Housel completed a telephone
consultation with Petitioner for "[s]houlder pain after rabies vaccine."  Pet. Ex. 4 at 174.  NP
Housel summarized Petitioner's clinical course:

> Petitioner received rabies #1 [] [October 29, 2018] to her left arm without
> [adverse event].  Rabies #2 . . . was [November 5, 2018] [] to her left [arm].  The
> site was "high" and she had pain onset at about 48 hours.  She recalls it being
> uncomfortable, achy, but this pain was not profound.  She does not recall [details]
> [] about its resolution.  Rabies #3 [] [was] [November 19, 2018] []; left arm.  This
> time the site was "low."  She had profound left shoulder pain onset at 24 hours.
> She also received Tdap, documented right arm.

Id.  The record further noted Petitioner described the left shoulder pain as a "severe ache and
sharp [pain] with movement[]," and "excruciating at 10/10" in severity.  Id.  Petitioner reported
"no local inflammation symptoms of erythema, edema[,] or warmth."  Id.  NP Housel's
assessment was that Petitioner "experienced severe left shoulder pain after . . . rabies vaccine
series," noting "[h]er pain onset was 48 hours after [rabies] dose #2, but less severe, and 24 hours
after dose #3 to the same arm (left) and profound."  Id. at 175.  NP Housel noted that "[w]hile
Tdap vaccine is associated with [brachial neuritis], [Petitioner's] pain onset at 24 hours is too
early, supporting [that the Tdap vaccine] is not the involved vaccine."  Id. at 176.  She added that
"the timing of onset after [Petitioner's] rabies doses #1 & 2 are all within the expected window
and it is reasonable that dose #3 was exacerbatory or simply coincident."  Id.

5

A follow-up assessment with NP Laurie Housel on June 28, 2019 reaffirmed that the clinical evidence "evaluating a possible relationship between brachial neuritis and the receipt of rabies vaccines supports a consistent causal association to immunization: [v]accine product related reaction." Pet. Ex. 4 at 147 (emphasis omitted). "In [Petitioner's] case, there was suggestion of symptoms with her second [rabies] dose and a dramatic onset after her third implying a relationship." Id.

Petitioner continued treatment with Southeast Neurology through 2020. Pet. Ex. 6 at 46-55. On June 20, 2020, Dr. Fernando Franco noted that Petitioner had a history of "rabies vaccine [left] deltoid on Nov[ember] 2018" and received "three injections." Id. at 52. He further wrote, that "[a]fter [the] second injection [Petitioner] complained of pain and paresthesia in [left] arm," which Dr. Franco described as brachial neuritis vs. C8-T1 neuropathy. Id. And at a visit on October 6, 2020, Dr. Farouk Khan's assessment was "brachial neuritis (left) [secondary] to anti-rabies vaccine injection," with "residual weakness." Id. at 46 (emphasis omitted).

After relocating to Fort Bragg, North Carolina, Petitioner contacted the Army Medical Center on February 22, 2021, requesting a "referral [renewal] for [physical] therapy on left shoulder/arm." Pet. Ex. 9 at 18. Petitioner's current pain was 0/10. Id. Petitioner reported "an adverse reaction with the first dose [of the rabies vaccine] and developed weakness in her left shoulder and arm with paresthesia and weakness." Id. at 20.

On March 31, 2021, Petitioner underwent a physical therapy ("PT") evaluation at Pivot Physical Therapy for her left shoulder pain diagnosed as cervical radiculopathy. Pet. Ex. 7 at 81. She reported that her symptoms began in "November of 2018 when she had a series of [three] rabies vaccines. [Petitioner] state[d] that she had a terrible reaction to one of the last [two] vaccines." Id. Petitioner reports that she "start[ed] PT in Alabama last October." Id. She was discharged from PT on June 4, 2021 after sixteen sessions. Id. at 129-31.

### B. Affidavits/Declarations and Hearing Testimony

#### 1. Petitioner

Petitioner submitted a declaration (signed November 9, 2021) and an affidavit (executed April 4, 2023) in this matter and testified at the onset hearing (April 1, 2025). Pet. Exs. 2, 14; Tr. 33.

Before vaccination, Petitioner described herself as healthy and very active. Tr. 39. She regularly performed high-intensity interval training and went rock-wall climbing five days a week, she walked her two German Shepherds daily, and she participated in a weekly spouses' volleyball group. Tr. 39-40. Petitioner is right-hand dominant. Tr. 38. Her prior medical history included a right wrist injury requiring surgery in 2007 or 2008, a tonsillectomy, and a pilonidal cyst. Tr. 37-38. She denied any chronic conditions and any prior injuries to the left upper extremity. Tr. 37.

In 2018, she worked at the Fort Rucker (now Fort Novosel) veterinary clinic, starting November 8, 2018, which is a date she remembers because it coincided with her father's kidney

6

surgery.  Tr. 41, 47-48.  Petitioner testified that rabies vaccination was a condition of her employment at the veterinary clinic.  Tr. 41-42.  Tdap was presented at the clinic as an additional requirement related to potential animal bites.  Tr. 42.  Prior to the first rabies vaccine, the first of these vaccinations, Petitioner reported no shoulder pain.  Tr. 43-44.

She also reported no shoulder pain before the second rabies vaccination.  Tr. 44.  Following the second rabies vaccine, Petitioner reported tenderness at the site of vaccination with achiness that appeared within a few hours of vaccination and resolved within 24 hours without medication or activity limitation.  Tr. 44-45.

On November 19, 2018, the date Petitioner received her third rabies vaccine and Tdap vaccine, she testified she had no pain in her left shoulder or arm or any issue that limited her ability to work.  Tr. 45, 49.  The nurse stated she would administer the third rabies vaccine in Petitioner's right arm and Tdap in the left arm because the prior rabies doses had been given in the left arm.  Tr. 46-47; see also Pet. Ex. 14 at ¶¶ 5, 8.  Petitioner returned to work after the injections, exercised that evening, slept normally, and had no pain on November 19, 2018.  Tr. 46, 50-51.  The following day, November 20, Petitioner stated she had no pain and did not experience anything "out of the ordinary."  Tr. 51-52.

According to her testimony and journal, Petitioner's "real" pain began suddenly after lunch on Wednesday, November 21, 2018, more than 48 hours after vaccination.  Tr. 52-55.  Petitioner described the pain as an intense, burning "zinger" sensation radiating down her left arm.  Tr. 50, 52.  By that night, Petitioner could not sleep, and the next day (Thursday, November 22) she could not lift her arm.  Tr. 53; see also Pet. Ex. 12 at 3; Pet. Ex. 14 at ¶¶ 5, 10-13, 15.  She canceled her planned workout that Wednesday evening, November 21, and coworkers and supervisors observed her distress and functional limitations.  Tr. 56-58, 74-76.  Petitioner continued working by modifying duties (e.g., avoiding lifting boxes, avoiding handling larger animals, and walking only smaller animals with her right arm).  Tr. 57, 75.  At home, she required assistance with activities of daily living, including fastening a bra, doing her hair, reaching a seatbelt, carrying groceries, and walking both dogs.  Tr. 54, 58-60.  She discontinued rock-wall climbing and other workouts.  Tr. 58.

Petitioner initially self-treated with ice, heat, and over the counter analgesics.  Tr. 56, 75.  When symptoms persisted, she sought care with her primary physician, Dr. Marsden, who suggested keeping a symptom log and considering legal advice because "one of these vaccines" (third rabies or Tdap) could be the cause.  Tr. 56, 72; see also Pet. Ex. 14 at ¶ 2; Pet. Ex. 12 at 2.  Petitioner testified she began the journal on December 12, 2018, documenting that the "real pain" started after lunch on November 21, escalated that night, and left her unable to raise her arm by the following day.  Tr. 53-54, 72.  She testified that some entries were written the day of the noted event, and others within days thereafter.  Tr. 68-69, 72.  Petitioner explained that portions of her journal that are crossed out reflected contemporaneous frustration, not later-in-time alteration.  Tr. 70-71.

In April 2019, Petitioner underwent a causality assessment interview with NP Housel.  Tr. 79.  Petitioner found the interview rushed and confusing and she disputed some of the details of the assessment.  Tr. 80-81; Pet. Ex. 14 at ¶ 6.  Petitioner believed NP Housel (who she

7

referred to as "Laurie") made errors, including onset.  Pet. Ex. 14 at ¶¶ 6-7.  When Petitioner received the written assessment on July 30, 2019, she annotated it to correct errors, including onset (noting "just over 48 [hours] after lunch Wednesday [November 21]; Thursday couldn't move; Pain 10/10").  Pet. Ex. 14 at ¶¶ 7-8; see also Pet. Ex. 12 at 14-15; Pet. Ex. 13 at 1.  Petitioner noted in the margins that she spoke to someone who told her "its about malpractice so we have the high/low injection recorded, placement of needle."  Pet. Ex. 13 at 1.

A VAERS report referenced only the rabies vaccine.  Tr. 61-62.  Petitioner explained this likely reflected medical records that listed that the "[rabies] vaccine was given in [her] left [arm]," despite her consistent recollection that the Tdap vaccine was administered in her left arm and the third rabies vaccine in her right arm.  Tr. 62-63; Pet. Ex. 14 at ¶ 8.

Petitioner located her misplaced journal while preparing for a move.  Pet. Ex. 14 at ¶ 1.  Although she began keeping the journal in December 2018, she did not provide it to her counsel's paralegal until March 22, 2023.  Id.  She affirmed under oath that Exhibit 12 is a true and correct copy of her journal notes, generally made on or within days of the described events.  Id. at ¶ 2.  She confirmed she first consulted a malpractice attorney at Dr. Marsden's suggestion.  Id. at ¶ 3.  Ultimately, she did not pursue a malpractice case, and she was referred to current counsel in October 2020.  Id.  Petitioner reviewed Respondent's Rule 4(c) report at counsel's request and reiterated with "100% certain[ty]" that her severe left shoulder/arm pain, ultimately diagnosed as brachial neuritis, began shortly after lunch on November 21, 2018, more than 48 hours post-vaccination.  Id. at ¶¶ 9-13.  Petitioner reiterated that she had only localized post-injection tenderness on November 19 and no pain on November 20.  Id. at ¶¶ 10-11.

### 2.  Mallory Jones

Ms. Jones testified at the onset hearing and executed a declaration in this matter.  Tr. 6; Pet. Ex. 20.  Ms. Jones chose to testify because she witnessed Petitioner's pain, functional limitations, clinic visits, and treatments.  Tr. 24.

Ms. Jones is a registered nurse ("RN") since 2013.  Tr. 6-7.  Her nursing background includes ER and some ICU, followed by three years in same-day surgery.  Tr. 7.  For the last seven to eight months prior to testifying, she has worked PACU nights, covering late patients, taking calls for emergent cases, ordering supplies, and prepping the unit for the next day.  Tr. 7-8; Pet. Ex. 20 at ¶ 2.

Ms. Jones first met Petitioner at Fort Drum, New York around 2015 through their spouses' military unit and they have remained close friends since, speaking weekly.  Tr. 8-9, 22; Pet. Ex. 20 at ¶ 3.  She moved with Petitioner's family to Fort Rucker, Alabama in February 2018, worked locally in an ICU unit at a hospital.  Tr. 9, 24; Pet. Ex. 20 at ¶ 4.  Ms. Jones lived near Petitioner in Fort Rucker until she started travel nursing in July 2019 (but still retained Alabama as her "home base").  Tr. 24.  She recalled Petitioner starting at the Fort Rucker veterinary clinic in the Fall of 2018.  Tr. 10.

Regarding Petitioner's baseline health, Ms. Jones knew Petitioner to have significant GERD but "no major health problems," and specifically no issues with her left arm before the

vaccinations at issue. Tr. 11. She recalled Petitioner undergoing surgery on her right wrist years before they met. Tr. 31. She noted Petitioner's right arm was somewhat weaker than her left arm, but Petitioner remained fully active. Id.

Ms. Jones accompanied Petitioner to the second rabies vaccine appointment. Tr. 11; Pet. Ex. 20 at ¶ 5. Following the second rabies vaccination, she recalled Petitioner reporting muscle soreness and tenderness at the injection site, which resolved within a couple days and did not affect her activity levels. Pet. Ex. 20 at ¶ 5; Tr. 11-13, 26-27. She noted the administering nurse used a deltoid-mapping tool and, to Ms. Jones, the injection seemed "a little high," but was otherwise unremarkable. Tr. 26. Ms. Jones could not recall which arm Petitioner received the second rabies vaccine or which arm Petitioner reported muscle soreness and tenderness. Id. Ms. Jones did not attend Petitioner's first or third rabies vaccine appointments. Tr. 12-13; Pet. Ex. 20 at ¶ 6.

Regarding the third rabies and Tdap vaccines, Ms. Jones understood Petitioner received both shots "one in each arm." Tr. 12-14. Shortly thereafter ("within a few days to a week"), Petitioner reported a consistent intense pain in her left arm. Tr. 14-15. Ms. Jones stated Petitioner described the pain as "hot, searing, [] shooting," radiating from the shoulder down the arm, which based on her nursing experience, Ms. Jones identified the pain as nerve pain rather than typical post-injection soreness. Tr. 14-15, 28. Ms. Jones testified the pain was steady with intermittent severe "zingers or flare-ups," sometimes triggered by movement and sometimes occurring at rest. Tr. 15-16.

Ms. Jones encouraged Petitioner to seek evaluation for possible nerve injury. Tr. 14. She attended several of Petitioner's neurology visits with Dr. Khan (and his PA), and she recalled Petitioner reported intense left-shoulder pain radiating down the arm, with constant ache and episodic "zingers." Tr. 20-21. Ms. Jones did not recall accompanying Petitioner to primary care visits with Dr. Marsden. Tr. 20. In her opinion, Petitioner is vocal and accurately conveys symptoms clearly. Tr. 29-30. Ms. Jones often helped translate medical terminology during appointments. Id.

Before onset, Ms. Jones and Petitioner engaged in frequent high-intensity workouts at a community center and climbed the Fort Rucker rock wall multiple times per week. Tr. 16-18. After onset, Petitioner canceled rock-wall sessions and was unable to resume climbing. Tr. 18-19; Pet. Ex. 20 at ¶ 6. Ms. Jones recalled the rock climbing facility required signing a logbook upon entry/exit, while the community center did not track attendance. Tr. 30.

### 3.    Ian Rivenbark

Mr. Rivenbark testified at the onset hearing and executed a declaration. Tr. 84; Pet. Ex. 19.

He worked at the Fort Rucker veterinary clinic from 2018 to 2020 as the clinic NCOIC (non-commissioned officer in charge), the enlisted equivalent of a practice manager. Tr. 84. His job responsibilities "included day-to-day management of the facility[,] including management of

9

the employees." Pet. Ex. 19 at ¶ 2.  The clinic staff consisted of Captain Ryan (veterinarian), Mr. Rivenbark, two enlisted technicians, and one additional civilian employee.  Tr. 91-92.

Mr. Rivenbark interviewed Petitioner for the receptionist position in late summer or fall of 2018 and participated in the hiring decision with Captain Ryan.  Tr. 85-86; Pet. Ex. 19 at ¶ 3.  Petitioner began working at the clinic as the receptionist on November 8, 2018.  Pet. Ex. 19 at ¶ 4.  Mr. Rivenbark supervised Petitioner's day-to-day duties and saw her "constantly" throughout the workday because of the small clinic environment.  Tr. 91.  Petitioner worked a full-time schedule, generally Monday through Friday, 8:00 a.m. to 4:00 p.m. or 5:00 p.m., with no weekend or holiday shifts.  Tr. 92-93.  The clinic was closed on federal holidays, including Thanksgiving Day.  Tr. 93.

Petitioner's receptionist duties involved physical tasks due to the clinic's small staff size.  Tr. 87-88.  These included restraining dogs and cats for blood draws or vaccinations, walking animals for urine samples, and assisting with handling larger pets when needed.  Id.  Mr. Rivenbark testified that at the time Petitioner was interviewed and hired, she appeared fully capable of performing these physical requirements and showed no signs of limitation.  Id.; Pet. Ex. 19 at ¶ 3.

Mr. Rivenbark recalled Petitioner receiving a series of rabies vaccinations required for her employment.  Tr. 88-89.  He testified that after her final vaccine appointment, Petitioner spoke to him at her desk during a workday and asked whether he had experienced similar pain following his own vaccines.  Tr. 88-89, 95.  Petitioner reported that her shoulder pain was "way beyond" the soreness expected after a vaccine and that she could not lift her arm fully and her arm was sensitive to touch.  Tr. 89.  He believed this discussion occurred "pretty soon after" Petitioner was hired, "around the holiday season" in late 2018.  Tr. 95.  Mr. Rivenbark stated he knew that Petitioner began complaining of arm pain and physical limitations after the vaccines because the clinic would not have hired her had she experienced pain and limitations during her interview. Pet. Ex. 19 at ¶ 6.

Mr. Rivenbark testified that Petitioner's pain interfered with her ability to restrain larger animals, and the clinic informally adjusted her duties so that others handled physically demanding tasks.  Tr. 89-90, 94.  He recalled an incident where a technician accidentally bumped Petitioner's arm, causing her to cry from pain.  Tr. 89.  He stated that Petitioner "got used to [the pain]," but it continued and did not resolve while he remained at the clinic.  Tr. 90.

Petitioner took time off for medical appointments related to her arm, but Mr. Rivenbark could not recall Petitioner taking any extended leave or formally requesting workplace accommodations.  Tr. 94.  He did not recall Petitioner submitting anything in writing documenting her condition, nor did he know whether she filed a workers' compensation claim.  Tr. 96-97.  He had not been interviewed about Petitioner's injury prior to the hearing.  Tr. 97.

### 4. Chloe Morrow-Terwilliger

Ms. Morrow-Terwilliger executed a declaration in this matter.  Pet. Ex. 21.  She did not testify at the onset hearing.  See Tr. 3.

10

Ms. Morrow-Terwilliger is Petitioner's daughter and was living with Petitioner in 2018. Pet. Ex. 21 at ¶¶ 2-3. She recalled that Petitioner began working as a receptionist at the Fort Rucker veterinary clinic on November 8, 2019, the same day her grandfather (Petitioner's father) underwent kidney surgery. Id. at ¶ 4. According to Ms. Morrow-Terwilliger's declaration, Petitioner was not experiencing any left shoulder or arm pain when she began her job. Id. at ¶ 5. "Sometime shortly after [Petitioner] started her new job, she went to get vaccines" and "developed pain in her left arm after the vaccines." Id. at ¶ 6. Ms. Morrow-Terwilliger noted the pain was severe and constant. Id. at ¶ 7. Petitioner would vocalize pain whenever she moved her arm. Id. Ms. Morrow-Terwilliger assisted her mother with daily activities, including walking the dog, carrying groceries, cooking, and fixing her hair, because Petitioner could not lift or reach overhead with her left arm. Id. She further noted that before the pain began, they regularly went rock climbing together several times a week, but after the pain began, they stopped rock climbing because of Petitioner's pain. Id. at ¶ 8.

### III. PARTIES' ARGUMENTS

#### A. Petitioner's Contentions

Petitioner asserts that the onset of her brachial neuritis post-Tdap vaccination occurred within the 2-28 day window in the Vaccine Injury Table, and thus, she meets the timeframe for a Table claim. Pet. Pre-Hearing Br. at 1-2; Pet. Post-Hearing Br. at 1.

Petitioner asserts her "medical records and testimony establish that she, more likely than not, developed severe pain in her left shoulder no less than 48 hours after she received the Tdap vaccine on November 19, 2018." Pet. Pre-Hearing Br. at 20. For support, she cited to her journal entries, testimony, and affidavits that document her "severe pain" or "real pain" began after lunch on November 21, 2018, more than 48 hours after Tdap vaccination. Id. at 20-24; Pet. Post-Hearing Br. at 20-24. She maintains that the evidence shows she did not experience severe left arm pain prior to the vaccinations on November 19, 2018. Pet. Pre-Hearing Br. at 20-21. Further, "[n]othing in the medical records effectively contradicts a conclusion that Petitioner's severe arm pain began less than two days after vaccination." Id. at 23.

Petitioner contends "[t]his is not a case where [P]etitioner's testimony and that of her witnesses conflicts with weight of the medical records; it is a case where the contemporaneously created medical records do not provide a clear answer to the question [of] precisely when [] [P]etitioner's severe left arm pain [began]." Pet. Pre-Hearing Br. at 24 (emphasis omitted); see also Pet. Post-Hearing Br. at 23.

Because Petitioner did not seek medical treatment until three weeks after her Tdap vaccination, she argues "her medical records do not provide a precise timeframe for the onset of her severe left arm pain." Pet. Pre-Hearing Br. at 21. And thus, given the lack of "detail regarding the day or hour during which Petitioner's pain began," Petitioner maintains her "testimony and other evidence fills the gap" left by the medical records. Id. at 21-22.

11

Further, according to Petitioner, "no medical record effectively contradicts Petitioner's testimony that her severe arm pain began on the second day after vaccination." Pet. Post-Hearing Br. at 22. Petitioner acknowledges that NP Housel, five months post-vaccination,[6] documented a conflicting onset period of 24 hours. Id.; Pet. Pre-Hearing Br. at 23. However, Petitioner argues NP Housel changed her opinion during a follow-up appointment, rendering her statements inconsistent. Pet. Post-Hearing Br. at 22-23; Pet. Pre-Hearing Br. at 23-24.

Petitioner acknowledged "[m]edical records created contemporaneously with the events they describe are generally considered to be more trustworthy." Pet. Pre-Hearing Br. at 17 (citing Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993)). Petitioner further acknowledged that medical records that "are clear, consistent, and complete" are "afforded substantial weight." Id. at 18 (quoting Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005)). However, when written records are inconsistent, they "should be accorded less deference than those which are internally consistent." Id. (citing Lowrie, 2005 WL 6117475, at *19). Thus, Petitioner argues NP Housel's statements should be afforded less weight and the testimony and affidavit statements do not conflict with the medical records and should be afforded weight. Pet. Post-Hearing Br. at 23.

Petitioner concludes that she has provided preponderant evidence that her onset occurred within the Table's 2-28 day window for brachial neuritis post-Tdap vaccination. Pet. Post-Hearing Br. at 1. In the alternative, should the Court determine that her onset fell outside the Table timeframe, Petitioner notes other Program cases have prevailed on off-Table claims and she will provide expert opinion to support a causation-in-fact claim. Pet. Pre-Hearing Br. at 2.

### B.   Respondent's Contentions

Respondent contends Petitioner failed to provide preponderant evidence that her symptom onset occurred between 2-28 days following her Tdap vaccine, as required by the Vaccine Injury Table, and therefore, her Table claim must be dismissed. Resp. Post-Hearing Br. 1, 15. Respondent further contends that the issue of onset is dispositive to Petitioner's claim, due to onset predating her Tdap vaccination, and thus, her petition should be dismissed. Id. at 1-2, 2 n.2, 15.

Respondent argues that the contemporaneous medical records conclusively establish that Petitioner's left shoulder pain began either prior to receipt of the Tdap vaccine or within 24 hours of Tdap vaccination, both of which should result in a dismissal of Petitioner's petition and/or Table claim. Resp. Pre-Hearing Br. at 10-11; Resp. Post-Hearing Br. at 7-8. For support, Respondent emphasizes that throughout multiple medical encounters, Petitioner consistently attributed her left shoulder pain to earlier doses of the rabies vaccine, not the Tdap vaccine. Resp. Pre-Hearing Br. at 10; Resp. Post-Hearing Br. at 7; see, e.g., Pet. Ex. 4 at 175, 216; Pet. Ex. 6 at 52; Pet. Ex. 7 at 81; Pet. Ex. 9 at 20.

---

[6] Petitioner challenges the accuracy of NP Housel's assessment in her briefs. See Pet. Pre-Hearing Br. at 23-34; Pet. Post-Hearing Br. at 23.

Respondent asserts that the affidavits and testimony Petitioner submitted in support of a later onset are vague, inconsistent, and were created "years after vaccination, during the course of litigation," and should therefore be afforded minimal evidentiary weight. Resp. Pre-Hearing Br. at 12-16 (citing Kohl v. Sec'y of Health & Hum. Servs., No. 16-748V, 2022 WL 4127217, at *24 (Fed. Cl. Spec. Mstr. Aug. 18, 2022); Reusser v. Sec'y of Health & Hum. Servs., 28 Fed. Cl. 516, 523 (1993)). Respondent notes that the declarations from Petitioner's daughter, friend, and employer do not provide specific evidence regarding the timing of Petitioner's symptoms and "cannot overcome the evidence contained in the medical records." Id. at 12-14; see also Resp. Post-Hearing Br. at 10-12. Respondent also highlights inconsistencies between Petitioner's affidavit and testimony and other evidence in the record, arguing "[P]etitioner's more recent recollections are at odds with numerous contemporaneous medical records documenting symptoms after [P]etitioner's earlier rabies vaccines and pain quickly following the rabies and Tdap vaccine administered on November 19, 2018." Resp. Pre-Hearing Br. at 14-16; Resp. Post-Hearing Br. at 12-15. Respondent reiterates "[Petitioner's] testimony essentially amounts to 'the recollection[s] of a party to a lawsuit many years later,' which are "generally [less] reliable' than 'written documentation recorded by a disinterested person at or soon after the event at issue.'" Resp. Post-Hearing Br. at 14 (quoting Reusser, 28 Fed. Cl. at 523). Respondent therefore concludes that Petitioner's affidavits and testimony, which were offered during the course of litigation and years after the events in question, cannot overcome the contemporaneous medical records in this case. Resp. Pre-Hearing Br. at 15-16; Resp. Post-Hearing Br. at 14-15.

## IV.    DISCUSSION

### A.    Applicable Legal Standard

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (noting it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe, "in general, warrant consideration as trustworthy evidence." Cucuras, 993 F.2d at 1528; see also Doe/70 v. Sec'y of Health & Hum. Servs., 95 Fed. Cl. 598, 608 (2010) ("Given the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law."); Rickett v. Sec'y of Health & Hum. Servs., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). This presumption is based on the linked propositions that (i) sick

13

people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, 809 F. App'x 843 (Fed. Cir. 2020); Cucuras v. Sec'y of Health & Hum. Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525.

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. Lowrie, 2005 WL 6117475, at *20. Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony, especially where such testimony conflicts with the record evidence. Cucuras, 993 F.2d at 1528; see also Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1947))), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## V. ONSET ANALYSIS

Prompting this fact ruling is the question of the onset of Petitioner's brachial neuritis. The undersigned finds that Petitioner's medical records do not support Petitioner's claim of brachial neuritis injury following receipt of the Tdap vaccine for the following reasons.

### A. Petitioner's Most Contemporaneous Medical Records Place Onset After the Second Rabies Vaccination

Petitioner's medical providers document that Petitioner reported the onset of her pain began after her second rabies vaccination administered November 5, 2018. According to Petitioner's contemporaneously provided histories, she experienced left shoulder pain after her second rabies vaccine. There are three medical record entries by three different providers that support this finding.

Petitioner first complained of left shoulder pain to Dr. Marsden on December 12, 2018. Dr. Marsden documented Petitioner "complain[ed] of left shoulder pain since receiving [two]

injections of the rabies vaccine." Pet. Ex. 4 at 216. Dr. Marsden also noted Petitioner had received a total of three rabies vaccines at this time of the visit.

The second record was authored by NP Housel, who, on April 16, 2019, investigated the cause of Petitioner's pain and documented Petitioner's pain onset occurred after her second rabies vaccination. She noted Petitioner "experienced severe left shoulder pain after . . . rabies vaccine series," noting "[h]er pain onset was 48 hours after [rabies] dose #2, but less severe, and 24 hours after dose #3 to the same arm (left) and profound." Pet. Ex. 4 at 175. NP Housel also explained that "[i]n [Petitioner's] case, there was suggestion of symptoms with her second [rabies] dose and a dramatic onset after her third implying a relationship." Id. at 147.

Dr. Franco made the third note on June 20, 2020, documenting that "[a]fter [the] second injection [Petitioner] complained of pain and paresthesia in [left] arm." Pet. Ex. 6 at 52.

Thus, three different medical providers, including Petitioner's PCP, the NP who investigated the cause of Petitioner's shoulder pain, and a second physician (neurology), all independently documented that Petitioner reported that the pain and/or paresthesias in her left arm began after her second rabies vaccination. This places onset some time after November 5, 2018, but before Petitioner received her Tdap vaccination (and third rabies vaccine) on November 19, 2018.

Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." Cucuras, 993 F.2d at 1528. The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." Id. Thus, treating physician statements are typically "favored" and given weight due to the fact treating physicians are likely to be in the best position to assess an injury. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326.

### B. Petitioner's Most Contemporaneous Statements Reported in Medical Records and VAERS Relate Her Symptoms to the Rabies Vaccinations

Further, the totality of the medical record evidence establishes that Petitioner attributed her pain and/or paresthesias to her rabies vaccinations and not her Tdap vaccine. From her first presentation to Dr. Marsden on December 12, 2018, Petitioner consistently linked her left shoulder pain to the rabies vaccine series, not to the Tdap vaccine. She reported "left shoulder pain since receiving [two] injections of the rabies vaccine" and noted that the pain had persisted since those injections. Pet. Ex. 4 at 216. At her January 4, 2019 follow-up appointment, she again described the pain "ha[d] been present since . . . receiving a vaccine for rabies." Id. at 210. Petitioner's Tdap vaccine was not noted or discussed during either visit.

The January 8, 2019 VAERS[7] report similarly attributed onset to the rabies vaccine. The report identified the vaccine at issue as the third rabies vaccine. The report noted "[Petitioner] state[d] that after getting her third rabies injection[,] the next day [her] arm became sore and within a couple of days she had severe pain when moving her arm." Pet. Ex. 11 at 1. The Tdap vaccine was not mentioned.

Subsequent neurology records described "constant pain since rabies vaccine" and "brachial neuritis (left) [secondary] to anti-rabies vaccine injection." Pet. Ex. 6 at 8-9, 46. Orthopedist Dr. Farris noted Petitioner reported a "several month history of left shoulder pain" that "began after a rabies vaccination." Pet. Ex. 5 at 5. The Tdap vaccine was not mentioned at any of these visits.

Petitioner's MRI record noted "left shoulder pain . . . after [third] rabies vaccine." Pet. Ex. 4 at 52. Similarly, her EMG/NCS report documented Petitioner was "[status post] rabies vaccine in Nov[ember] 2018." Pet. Ex. 6 at 22. The Tdap vaccine was not mentioned in either record.

When requesting a PT referral, Petitioner reported "an adverse reaction with the first dose [of the rabies vaccine] and developed weakness in her left shoulder and arm with paresthesia and weakness." Pet. Ex. 9 at 20. And at PT, Petitioner reported that her symptoms began after "she had a series of [three] rabies vaccines," with "a terrible reaction to one of the last [two] vaccines." Pet. Ex. 7 at 81. The Tdap vaccine was not mentioned.

These contemporaneous medical record statements reflect a consistent narrative of left shoulder pain associated with the rabies vaccinations, and do not identify Tdap as the precipitating vaccine.

### C. Petitioner's Treating Providers Consistently Relate Petitioner's Symptoms to Her Rabies Vaccination(s) and/or Directly Exclude Her Tdap Vaccine As Causal

Multiple treating clinicians expressed opinions regarding causation, none of which related Petitioner's pain to her Tdap vaccine.

NP Housel concluded that "[w]hile Tdap vaccine is associated with [brachial neuritis], [Petitioner's] pain onset at 24 hours is too early, supporting [that the Tdap vaccine] is not the involved vaccine." Pet. Ex. 4 at 176. NP Housel reaffirmed through a follow-up assessment that the clinical evidence supported a "consistent causal association" between "brachial neuritis and the receipt of rabies vaccines." Id. at 147.

Neurologist Dr. Khan later assessed Petitioner with "brachial neuritis (left) [secondary] to anti-rabies vaccine injection," with "residual weakness." Pet. Ex. 6 at 46.

---

[7] VAERS or the Vaccine Adverse Event Reporting System is "a passive reporting system" that "accepts and analyzes reports of adverse events (possible side effects) after a person has received a vaccination. Anyone can report an adverse event to VAERS." About VAERS, VAERS, https://vaers.hhs.gov/about.html (last visited Jan. 6, 2026).

Dr. Franco described Petitioner's history as "rabies vaccine [left] deltoid on Nov[ember] 2018" with "pain and paresthesia in [the] left arm" thereafter, which he characterized as "brachial neuritis vs. C8-T1 neuropathy." Pet. Ex. 6 at 52.

None of Petitioner's treating providers recorded an opinion that Tdap was the more likely causal vaccine. Instead, those who addressed causation explicitly either identified the rabies vaccine series as responsible or rejected Tdap because of the timing of onset.

### D. The Undersigned Is Not Persuaded by Later-in-Time Declarations, Affidavits, Testimony, or Journal Entries Alleging Onset After Tdap Vaccination

The undersigned has carefully considered Petitioner's evidence, including Petitioner's affidavit, hearing testimony, and journal entries, as well as the declarations and testimony of Ms. Jones, Mr. Rivenbark, and Ms. Morrow-Terwilliger, which collectively describe a previously healthy, active woman who developed severe and persistent left shoulder and arm pain after the 2018 vaccinations, with substantial functional limitations. However, the undersigned finds there is not preponderant evidence that onset occurred after the Tdap vaccination for several reasons.

First, these declarations were executed either in anticipation of litigation or after litigation was initiated and/or and a substantial passage of time since Petitioner last visited a provider for her symptoms. And here, the undersigned finds statements made in anticipation of litigation or years after the events in question that contradict the contemporaneous medical records are less reliable than statements made contemporaneously with the events in question. See Murphy, 23 Cl. Ct. at 733 ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight."); Reusser, 28 Fed. Cl. at 523 (noting "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); Nomick v. Sec'y of Health & Hum. Servs., No. 22-1538V, 2025 WL 2953202, at *9 (Fed. Cl. Spec. Mstr. Sept. 19, 2025) ("While Petitioner has offered a total of six declarations, all were signed *three or four years* after the events in question, and after this matter was in litigation. The significant gap between the events and the testimony, along with the litigation context, greatly reduces their evidentiary value."); see also Zumwalt v. Sec'y of Health & Hum. Servs., No. 16-994V, 2019 WL 1953739, at *19 (Fed. Cl. Spec. Mstr. Mar. 21, 2019) (rejecting opinion from a treating provider when he presented an opinion two-and-one-half years after treatment and after litigation was initiated), mot. for rev. den'd, 146 Fed. Cl. 525 (2019).

Moreover, Petitioner's journal and handwritten annotations to NP Housel's assessment (exhibits 12-13) were not produced until April 2023, more than one-and-one-half years after Petitioner filed her petition and after Respondent raised the onset issue in this case. See, e.g., Cannon v. Sec'y of Health & Hum. Servs., No. 21-190V, 2025 WL 3679050, at *8 (Fed. Cl. Spec. Mstr. Nov. 17, 2025) (acknowledging issues with and partly discounting statements "drafted in pursuit of litigation (and after the critical deficiencies in the record had been identified)"); Duda v. Sec'y of Health & Hum. Servs., No. 19-31V, 2021 WL 4735857, at *8

17

(Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters).

Second, the declarations are not consistent with Petitioner's statements in the medical records, and therefore, the undersigned finds more weight should be given to the contemporaneous statements in her medical records. See Vergara ex rel. J.A.V. v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); Campbell, 69 Fed. Cl. at 779 ("It is, of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight.").

Third, Petitioner's statements in her medical records regarding onset conflict with her statements in her declaration, affidavit, and journal, as well as her testimony at the onset hearing. To the extent these later statements attempt to establish that the onset of Petitioner's "real" pain occurred after the November 19, 2018 Tdap vaccination, specifically on November 21, 2018, the undersigned finds these statements less persuasive than the contemporaneous medical records and clinician assessments discussed above. See, e.g., Greene v. Sec'y of Health & Hum. Servs., No. 11-631V, 2015 WL 9056034, *17 (Fed. Cl. Spec. Mstr. July 31, 2015) ("Petitioner did not offer enough sufficiently compelling testimony or other evidence to refute the contemporaneous medical records, which firmly support an onset . . . later than that alleged . . . . It is understandable that an individual might have trouble recalling, several years later, whether a symptom began earlier or later within a [specific] period . . . . But in this case, Petitioner has not shown it to be more likely than not that his recollection is correct, and the medical records [are] wrong."); Mueller v. Sec'y of Health & Hum. Servs., No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) ("Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate.").

Moreover, the undersigned finds the witnesses' recollections are imprecise and lack detail and depend on Petitioner's own evolving account rather than their independent recollections. For example, in Ms. Jones' declaration executed in December 2024, she "recall[s] that [Petitioner's] arm pain began after she started the job" on November 8. Pet. Ex. 20 at ¶ 6. But see Tr. 14-15 (testifying Petitioner's pain began "within a few days to a week" of the last vaccines on November 19). Mr. Rivenbark reports in his declaration that Petitioner's "arm pain and physical limitations occurred after the vaccines." Pet. Ex. 19 at ¶ 6. Ms. Morrow-Terwilliger also describes (without a specific onset date) that Petitioner's "pain was severe and constant as soon as it started." Pet. Ex. 21 at ¶ 8. In contrast to these statements, Petitioner's medical records in 2019 and 2020 document onset with more specificity, relating the symptoms to a date or particular vaccination. Thus, the undersigned finds the witnesses' recollections of timing are not "consistent, clear, cogent, and compelling." Sanchez, 2013 WL 1880825, at *3.

Further, the after-the-fact statements in the declarations/affidavits/testimony directly conflict with medical records created for the purpose of diagnosis and treatment. Those medical records repeatedly attribute onset to the rabies vaccinations, identify pain beginning after the

18

second and third rabies doses, with worsening and "profound" left shoulder pain after the third rabies vaccination. See Pet. Ex. 4 at 174, 210, 216; Pet. Ex. 11 at 1; Pet. Ex. 6 at 52; Pet. Ex. 7 at 81. Therefore, the undersigned finds Petitioner's statements in her contemporaneous medical records more persuasive.

The undersigned acknowledges that the presumption that "medical records are accurate and complete as to all the patient's physical conditions" has been rejected. Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021). She further notes that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011). However, the undersigned finds it compelling that the after-the-fact statements from the declarations/affidavits/testimony conflicts with more detailed and internally consistent medical records created for the purpose of diagnosis and treatment.

Accordingly, the undersigned is not persuaded that Petitioner has established, by a preponderance of the evidence, an onset of brachial neuritis symptoms more than forty-eight hours after the November 19, 2018 Tdap vaccination. The more reliable and credible evidence from Petitioner's contemporaneous medical records and the opinions of her treating clinicians, supports a finding that onset occurred after her second rabies vaccination on November 5, 2018, which worsened after her third rabies vaccination on November 19, 2018. The undersigned does not find preponderant evidence that onset of Petitioner's pain and/or paresthesias, which were manifestations of her brachial neuritis, occurred relative to her Tdap vaccination.

## VI.     CONCLUSION

For all the foregoing reasons, the undersigned finds, based on the record as a whole, that there is preponderant evidence that the onset of Petitioner's symptoms began after Petitioner received the second rabies vaccination on November 5, 2018. Since the rabies vaccine is not a covered vaccine under the Vaccine Injury Table, the next step is to dismiss Petitioner's claim.

The parties shall file a joint motion to dismiss in 30 days, **by Friday, February 6, 2026**, which preserves the right for Petitioner to file a motion for review of this Ruling. In the alternative, Respondent shall file a motion to dismiss in 30 days, **by Friday, February 6, 2026**, and the Petitioner may file a response 30 days thereafter, not later than **by Monday, March 9, 2026**.

**IT IS SO ORDERED.**

                                                                                       **s/Nora Beth Dorsey**
                                                                                       Nora Beth Dorsey
                                                                                       Special Master